UNITED STATES DISTRICT COURT
THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| RYAN J. COLLINS, and HANNAH SLAUGHTER, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRIGHTSPRING HEALTH SERVICES, INC., BRIGHTSPRING HEALTH HOLDINGS CORP., RES-CARE, INC., and PHARMERICA CORPORATION,<br><br>*Defendants.* | Case No.   3:23-cv-343-BJB<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Ryan J. Collins ("Plaintiff Collins") and Hannah Slaughter ("Plaintiff Slaughter"), on behalf of themselves and all others similarly situated, assert the following against BrightSpring Health Services, Inc. ("BrightSping Health Services"), BrightSpring Health Holdings Corp. ("BrightSpring Health HoldCo"), Res-Care, Inc. ("ResCare" and, together with BrightSpring Health Services and BrightSpring Health HoldCo, "BrightSpring") and PharMerica Corporation ("PharMerica" and, together with BrightSpring, "Defendants"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## **INTRODUCTION**

1.     Plaintiffs bring this class action against BrightSpring and PharMerica for their (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including without limitation names, addresses, dates of birth, Social Security numbers, Medicaid numbers, Medicare numbers, and payroll information (collectively "PII"); (ii) failure to properly secure and safeguard highly valuable, protected personal health information,

including without limitation personal medication information, procedure history, and personal diagnosis information ("PHI" and, together with PII, "Private Information") (iii) failure to comply with industry standards to protect information systems that contain Private Information; (iv) unlawful disclosure of the Private Information of Plaintiffs and other members of the class; and (v) failure to provide adequate notice to Plaintiffs and other members of the class that their Private Information had been disclosed and compromised.

2. BrightSpring operates a "home and community-based healthcare services platform, focused on delivering complementary provider and pharmacy services to complex patients."

3. BrightSpring and its subsidiary companies focus their business on high-need, high-cost "senior" and "specialty" patients and focus their services on "the three critical services that the highest-need and highest-cost patients require" which are "clinical services, supportive care[,] and pharmacy solutions in lower-cost home and community settings to Medicare, Medicaid and commercially-insured populations."

4. BrightSpring offers its services under its own brand name—BrightSpring—and that of its indirect subsidiary: PharMerica.

5. Together, BrightSpring and PharMerica have a presence in all 50 states, employ millions of individuals, and serve over 350,000 patients per day.

6. In their roles as health services providers and employers, BrightSpring and PharMerica collect, store, maintain, and utilize the Private Information of millions of individuals.

7. In March 2023, however, BrightSpring and PharMerica failed to adequately safeguard this sensitive, valuable Private Information. Specifically, on March 12 and March 13, 2023, an unauthorized third-party accessed the Private Information of at least approximately 5.8 million individuals—including patients and former employees—stored on BrightSpring's and

PharMerica's systems and exfiltrated the Private information (the "Data Breach") from those systems.

8. While the Data Breach occurred on March 12-13, 2023, BrightSpring and PharMerica significantly delayed notifying impacted individuals. PharMerica did not send out notice (via U.S. mail) until May 12, 2023, two months later. Worse, PharMerica's initial notice was inadequate, and many individuals were not notified they were impacted by the Data Breach until PharMerica sent out a second notice on June 9, 2023, almost 3 months after the Data Breach occurred.

9. Similarly, BrightSpring didn't send out notice to impacted individuals such as Plaintiff Collins until June 21, 2023, more than 3 months after the Data Breach occurred.

10. Defendants' delay in notifying Plaintiffs and Class Members deprived them of the opportunity to take meaningful steps to mitigate the impact of the Data Breach.

11. Many constituencies recognize the value of Plaintiffs' and Class Members' stolen Private Information, including Defendants themselves, the cybercriminals who exfiltrated the Private Information, and the individuals whose information was compromised.

12. As a result of the Data Breach and delayed notice thereof, Plaintiffs and Class Members are at a substantially increased risk of identity theft, both currently and for the indefinite future. Plaintiffs' and Class Members' Private Information—including their names linked with their addresses, dates of birth, Social Security numbers, medications, and health insurance information—which was compromised by cybercriminals in the Data Breach—is highly valuable to bad actors who may seek to commit fraud and identity theft.

13. Plaintiffs, on behalf of themselves and all others similarly situated, bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, breach of confidence,

invasion of privacy—intrusion upon seclusion, violations of consumer protection statutes of their home states, violations of data protection statutes of their home states, and injunctive relief.

14.     Plaintiffs seek damages and injunctive relief requiring Defendants to, *inter alia,* (1) adopt reasonably sufficient practices to safeguard the Private Information in BrightSpring's and PharMerica's custody and control; and (2) to properly evaluate and monitor data in the custody of third parties hired by BrightSpring and PharMerica to prevent incidents like the Data Breach from recurring.

15.     Given that information relating to the Data Breach remains exclusively in Defendants' control, Plaintiffs anticipate that additional information in support for their claims will emerge during discovery.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class and Subclasses exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Members of the Class and Subclass defined below, and a significant portion of putative Class and Subclass Members are citizens of a different state than BrightSpring and PharMerica.

17.     This Court has personal jurisdiction over BrightSpring Health Services because BrightSpring is domiciled in the Commonwealth of Kentucky.

18.     This Court has personal jurisdiction over PharMerica because PharMerica is domiciled in the Commonwealth of Kentucky.

19.     This Court also has specific personal jurisdiction over BrightSpring related to this action because Plaintiffs' claims arise out of BrightSpring's business contacts in this state and district.

20.     This Court also has specific personal jurisdiction over PharMerica related to this action because Plaintiffs' claims arise out of PharMerica's business contacts in this state and district.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants BrightSpring and PharMerica maintain their principal places of business in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

22.     Plaintiff Collins is a resident of South Carolina. Plaintiff Collins received a letter from BrightSpring informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Collins' payroll information, including his name and Social Security number, Plaintiff Collins faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Collins has been bombarded with phishing emails, spam calls, and spam texts, which Plaintiff Collins has devoted a substantial amount of time to addressing. Additionally, Plaintiff Collins was forced to extend a credit monitoring service he had anticipated cancelling, and has spent up to an hour a day dealing with issues relating to the increase in calls, texts, and fraudulent activity.

23.     Plaintiff Slaughter is a resident of Indiana. Plaintiff Slaughter received a letter from PharMerica informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Slaughter's Private Information, including name, address, date of birth, and Social Security number, Plaintiff Slaughter faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Slaughter's identity has been stolen and her credit has been accessed by unauthorized

individuals multiple times. Plaintiff Slaughter has spent hundreds, if not thousands, of dollars addressing issues arising from these acts.

24.     Defendant BrightSpring Health Services, Inc. ("BrightSpring Health Services") is a Delaware corporation. BrightSpring Health Services maintains its principal place of business at 805 N. Whittington Parkway, Louisville, Kentucky 40222.  BrightSpring Health Services was incorporated on July 19, 2017, as Phoenix Parent Holdings Inc. in connection with a transaction to acquire now-subsidiary PharMerica Corporation, which was completed in December 2017. In March 2019, now-BrightSpring Health Services acquired BrightSpring Health Holdings Corp. and its subsidiaries and thereafter assumed its current name. BrightSpring Health Services operates through its direct and indirect subsidiaries Defendant BrightSpring Health Holdings Corp., Defendant Res-Care, Inc. (BrightSpring Health Services' predecessor), and Defendant PharMerica Corporation.

25.     Defendant PharMerica Corporation ("PharMerica") is a Delaware corporation. PharMerica maintains its principal place of business at 805 N. Whittington Parkway, Louisville, Kentucky 40222.

26.     Defendant Res-Care, Inc. ("Res-Care") is a Kentucky corporation. Res-Care maintains its principal place of business at 805 N. Whittington Parkway, Louisville, Kentucky 40222. Res-Care is BrightSpring Health Services' predecessor company.

27.     Defendant BrightSpring Health Holdings Corp. ("BrightSpring Health HoldCo") is a Delaware corporation. BrightSpring Health HoldCo maintains its principal place of business at 805 N. Whittington Parkway, Louisville, Kentucky 40222.

## FACTUAL ALLEGATIONS
### I.     BRIGHTSPRING AND PHARMERICA COLLECTED, STORED,

**MAINTAINED, AND UTIZLIED THE PRIVATE INFORMATION OF
PLAINTIFFS AND MEMBERS OF THE CLASS.**

### a. BRIGHTSPRING

28.     Defendant BrightSpring describes itself as "the leading provider of complementary home- and community-based health services for complex populations in need of specialized and/or chronic care."[1]

29.     BrightSpring "provide[s] services that high-need patients and clients require: supportive care, clinical and pharmacy solutions."[2] BrightSpring's services "include home health care, hospice and home care to seniors, long-term specialty care to behavioral and neuro rehabilitation populations, and pharmacy therapy management to patients across many settings."[3]

30.     BrightSpring serves approximately 350,000 patients annually and has employed millions of individuals itself and through subsidiaries.

31.     BrightSpring collects, stores, maintains, and utilizes the Private Information of, upon information and belief, millions of current and former employees (payroll information) and current and former patients (personal identifying information and personal health information).

### b. PHARMERICA

32.     PharMerica, a wholly-owned subsidiary of BrightSpring, describes itself as "a national leader in pharmacy services, serving our partners in over 3,100 long-term care, senior living, IDD/behavioral health, home infusion, specialty pharmacy, and hospital management programs[.]"[4]

---

[1] About Us, BRIGHTSPRING HEALTH SERVS., https://www.brightspringhealth.com/about-us/ (last accessed June 28, 2023).
[2] *Id.*
[3] *Id.*
[4] Who We Are, PHARMERICA, https://pharmerica.com/who-we-are/ (last accessed July 3, 2023)

33.     PharMerica provides pharmacy services to a clientele comprised of residents of senior living communities, nursing facilities, public health organizations, and post-acute care organizations and additionally provides infusion and oncology services.

34.     In 2019, BrightSpring and PharMerica merged, and made the following announcement upon completion of the transaction:

> Global investment firm KKR and BrightSpring Health Services ("BrightSpring"), one of the largest home and community-based health services providers, announced that KKR has closed on its acquisition of BrightSpring. As part of this transaction, BrightSpring has merged with PharMerica Corporation ("PharMerica") to now become a leading provider of home and community-based health and pharmacy services for high-need and medically complex populations.
>
> The strategic combination of BrightSpring and PharMerica creates a uniquely positioned, diversified health care platform with comprehensive care capabilities across clinical, pharmacy, and non-clinical support services in multiple care settings. Upon close, the combined company will serve over 300,000 clients daily in 47 states, Puerto Rico and Canada with combined revenue of approximately $4.5 billion.[5]

35.     After completion of the merger, Defendant BrightSpring Health Services is the indirect parent of PharMerica.

## II.     BRIGHTSPRING AND PHARMERICA ALLOWED THE PERSONAL INFORMATION OF PLAINTIFFS AND MEMBERS OF THE CLASS TO BE COMPROMISED IN A DATA BREACH.

36.     Unfortunately for Plaintiffs and Class Members, from March 12 through March 13, 2023, BrightSpring and PharMerica allowed an unauthorized third-party to access their systems and exfiltrate the Private Information of at least 5.8 million customers and employees.

37.     On March 28, 2023, the ransomware group Money Message posted online that it had accessed and exfiltrated approximately 4.7 terabytes of data from PharMerica and

---

[5] BrightSpring and PharMerica officially merge to become a leading provider of health and pharmacy services, BRIGHTSPRING HEALTH SERVS. (Mar. 6, 2019), https://www.brightspringhealth.com/media-hub/brightspring-pharmerica/

BrightSpring and demanded that Defendants pay a ransom to keep the information from leaking publicly.



38.    BrightSpring reacted to the news with the following announcement:

BrightSpring Health Services recently became aware of a cybersecurity incident that we have been investigating and addressing with the support of third-party cybersecurity experts. Additionally, we have notified law enforcement. This incident does not currently

impact our operations. While the investigation into the scope of the incident is ongoing, we are aware that an unauthorized actor claims to have taken certain data from our systems. We are working diligently to review any files involved to determine their contents. If we determine any patients' sensitive information is involved, we will notify them as quickly as possible and in accordance with applicable law.

39.     As updates to its original post, Money Message posted (1) a screen capture showing a directory on one drive called "PhiladelphiaNC"; and (2) a screen capture of a table which purported to show patient data-containing names, Social Security numbers, Medicaid numbers, and Medicare numbers; and (3) an Excel file with what appears to be PHI of at least 100 patients, including names, dates of birth, Social Security numbers, Medicaid numbers, Medicare numbers, allergies, and detailed diagnosis information and history.

40.     Media outlets that have viewed the information posted have confirmed the veracity of Money Message's claims. For example, DataBreaches.net confirmed that Social Security numbers listed in the "PhiladelphiaNC" drive posted by Money Message were valid, corresponded with the names listed, and confirmed that those individuals appeared to live in Pennsylvania with respect to four individuals listed in the post by Money Message.[6]

41.     Similarly, TechCrunch viewed the files and confirmed that the data included "protected health information . . . including allergy information, Medicare numbers and detailed diagnoses, including details about alcohol, drug and mental health-related illnesses."[7]

42.     On April 9, 2023, having not received payment from BrightSpring and/or PharMerica, the entire cache of data was posted online in 13 easily downloadable parts for anyone to access and exploit:[8]

---

[6] PharMerica and BrightSpring Health Services hit by Money Message (update2) (databreaches.net)
[7] US pharmacy giant says hackers accessed personal data of almost 6 million patients, TECHCRUNCH (May 16, 2023), https://techcrunch.com/2023/05/16/us-pharmacy-giant-says-hackers-accessed-personal-data-of-almost-6-million-patients/
[8] Ransomware gang steals data of 5.8 million PharMerica patients, BLEEPING COMPUTER (May 15, 2023), https://www.bleepingcomputer.com/news/security/ransomware-gang-steals-data-of-58-million-pharmerica-patients/#:~:text=Money%20Message%20claimed%20to%20have%20stolen%204.7%20TB,of%20the%20stolen%2



43.     In an April 14, 2023 update, Money Message provided files to DataBreachers.net showing patient data from four different facilities in North Carolina and one in Alabama purportedly from the data taken from BrightSpring and PharMerica. According to DataBreaches, the files had the following fields: "ID SSN PatientCode FirstName MI LastName County DOB MaritalStatus LevelOfService Birthplace Sex MedicaidNum MedicareNum OtherInsName OtherInsNum OtherInsGroupNum Comments Disabled PhysicianID AltPhysicianID DentistID DiagnosisID PharmacyID Payer Hospital EducationLevel FuneralHome RehabPotential Diagnosis DiagnosisText Prognosis Religion AdmittedFrom DatesOfStay1 DatesOfStay2 Nickname Race AmbulancePreference PreviousOccupation PatientAware NameOfChurch PharmacyMPS PharmacyOutside AdmissionNumber AllergiesText DiagnosesText TestPatient Notes."[9]

---

0data%20on%20their%20extortion%20site.
[9] PharMerica and BrightSpring Health Services hit by Money Message (update2), DATABREACHES.NET (April 8, 2023), https://www.databreaches.net/pharmerica-and-brightspring-health-services-hit-by-money-message/

44. Money Message further stated that they "had accessed all servers and locked almost the entire infrastructure of the companies," contrary to BrightSpring's initial claims that its operations had not been impacted.[10]

45. Despite the above, PharMerica and BrightSpring did not begin notifying impacted individuals that their Private Information had been compromised until May 12, 2023. Even then, PharMerica appeared to have limited its notifications to only a subset of the impacted individuals. As a result, PharMerica had to re-issue notice letters on June 9, 2023.

46. BrightSpring did not begin mailing notice letters to impacted individuals until June 21, 2023.

47. Below are relevant excerpts from the letter sent to Class Members by PharMerica:

**What Happened?** On March 14, 2023, we learned of suspicious activity on our computer network. Upon discovering the cybersecurity incident, we promptly began an internal investigation and engaged cybersecurity advisors to investigate and secure our computer systems. The investigation determined that an unknown third party accessed our computer systems from March 12-13, 2023, and that certain personal information may have been obtained from our systems as a part of the incident.

**What Information Was Involved?** We have been conducting a comprehensive review of the potentially affected data to determine whose personal information may have been obtained. On March 21, 2023, we determined that the data contained personal information that included your name, address, date of birth, Social Security number, medications and health insurance information.

48. Below are relevant excerpts from the letter sent to Class Members by BrightSpring:

**What Happened?** On March 14, 2023, we learned of suspicious activity on our computer network. Upon discovering the cybersecurity incident, we promptly began an internal investigation and engaged cybersecurity advisors to investigate and secure our computer systems. The investigation determined that an unknown third party accessed our computer systems from March 12 to 13, 2023, and that certain personal information may have been obtained from our systems as a part of the incident.

Following further investigation, we recently discovered that certain files including . . . payroll data were compromised. This is why we are writing to you now.

---

[10] *Id.*

**What Information Was Involved?** We have been conducting a comprehensive review of the potentially affected data to determine whose personal information may have been obtained. In late May 2023, we determined that the data included files that included your name and Social Security number. For some individuals, the files also contained an address and/ or date of birth[.]

49.     Despite the fact that BrightSpring and PharMerica were both well aware that Plaintiffs' and Class Members' Private Information had been taken by malicious bad actors and had been posted online for *anyone* to download, each notice letter sent by PharMerica and BrightSpring misleadingly claimed: "[W]e have no reason to believe that your information has been misused for the purpose of committing fraud or identity theft[.]"

### III.     BRIGHTSPRING AND PHARMERICA FAILED TO COMPLY WITH REGULATORY AND INDUSTRY STANDARDS.

50.     It is unsurprising that BrightSpring and PharMerica were targeted by Money Message, as healthcare service companies brim with confidential patient data and are a veritable goldmine for hackers who can lucratively monetize stolen information.

51.     The allure of vast, valuable patient data coupled with antiquated systems has made the healthcare industry a favored mark for ransomware groups. Healthcare industry systems are often mired in complexity, employ end-of-life devices and software, and/or are hamstrung by the prohibitive cost and challenges of upgrading.

52.     Over the period from 2009 to 2022, the exposure or unauthorized disclosure of PHI in the U.S. reached a staggering 382 million, a number exceeding the entire population, through 5,150 reported breaches affecting 500 or more individuals each.

53.     The frequency of healthcare data breaches has shown an alarming upward trajectory. In 2018, breaches impacting over 500 records were reported approximately once a day. By 2022, the daily breach rate had more than doubled. A 2022 Protenus report highlighted an upward trend in breaches, with 905 occurring in 2021, exposing over 50 million patient records—

an increase from the 758 reported in 2020. Notably, the first half of 2022 alone witnessed nearly 337 breaches, with almost 80% attributed to malicious activity.

54. Experian warns of the potentially ruinous financial consequences of healthcare data breaches. In addition to the debilitating personal impacts such as identity theft, victims also bear substantial costs to rectify the fallout—on average, $13,500, according to Ponemon Institute. These costs may encompass repaying fraudulent medical bills. More distressingly, victims may face denial of care, cancellation of insurance policies, credit score damage, and in extreme cases, potential job loss or threats to child custody.

55. Given the above and the sensitive nature of the Private Information that Plaintiffs and other Class Members entrusted to BrightSpring and PharMerica as their healthcare providers and employers, BrightSpring and PharMerica knew, or should have known, that hackers and cybercriminals valued the Private Information Defendants stored and would be able to commit identity theft, financial fraud, phishing, socially engineered attacks, healthcare fraud, and other identity-related fraud if they were able to exfiltrate that data from Defendants' systems.

56. BrightSpring and PharMerica were on notice that they were maintaining highly valuable data, which BrightSpring and PharMerica knew could lead to BrightSpring and PharMerica being targeted by cybercriminals and knew of the extensive harm that would occur if Plaintiffs' and Class Members' Private Information was exposed. BrightSpring and PharMerica thus owed a duty to Plaintiffs and Class Members to safeguard that Private Information.

57. BrightSpring and PharMerica also knew that, if Plaintiffs' and Class Members' Private Information stored on Defendants' systems was compromised, those individuals would reasonably spend time and effort to mitigate their damages and prevent identity theft and fraud if that data were exfiltrated.

58.     Plaintiffs and Class Members entrusted BrightSpring and PharMerica with their Private Information because BrightSpring and PharMerica are healthcare providers and employers. Thus, BrightSpring and PharMerica had a special relationship with Plaintiffs and Class Members, which provided an independent duty of care. BrightSpring and PharMerica owed a duty to use reasonable security measures because they undertook to collect, store, and use customers' and employees' Private Information.

59.     Accordingly, BrightSpring and PharMerica are liable to Plaintiffs and the Class for the compromise and unauthorized disclosure of Plaintiffs' and Class Members' Private Information.

60.     Because of the value of Private Information to hackers and identity thieves, companies in the business of obtaining, storing, maintaining, and securing Private Information, such as BrightSpring and PharMerica, have been identified as being particularly vulnerable to cyber-attacks. Cybersecurity firms have promulgated a series of best practices that at minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.[11] Organizations, companies, and banks—like BrightSpring and PharMerica—have an added incentive to harden their networks against unauthorized penetration because they directly control the data necessary to access consumers' financial accounts.

---

[11] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, Inc. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security/ [https://perma.cc/NY6X-TFUY].

61.     Further, federal and state governments have likewise established security standards and issued recommendations to reduce the number and size of data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses, highlighting the importance of reasonable data and cybersecurity practices. According to the FTC, the need for data and cybersecurity should be factored into all business decision-making.[12]

## A.  FTC GUIDANCE AND INDUSTRY STANDARDS

62.     BrightSpring and PharMerica are prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information including PII and PHI is an "unfair practice" in violation of the FTC Act.

63.     In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which established guidelines for fundamental data and cybersecurity principles and practices for business.[13] The guidelines note businesses should protect the personal customer and consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[14] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the

---

[12] *Start with Security: A Guide for Business* at 2, FTC (June 2015),
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[13] *Protecting Private Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business [https://perma.cc/9945-U4HV].
[14] *Id.*

system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[15]

64.     The FTC recommends that companies limit access to sensitive data; require complex passwords be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and (most pertinent here) verify that third-party service providers have implemented reasonable security measures.

65.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

66.     BrightSpring and PharMerica also have obligations created by other federal and state laws and regulations, contracts, industry standards, and common law to maintain reasonable and appropriate physical, administrative, and technical measures to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

67.     Given the magnitude of the risk and repercussions of a data breach or attack targeting this type of data, the likelihood of a data breach or attack, and BrightSpring's and PharMerica's explicit awareness of these vulnerabilities, BrightSpring and PharMerica should have taken every reasonable precaution in developing a robust security program and protecting Plaintiffs' and the Class Members' Private Information.

---

[15] *Id.*

68.     Yet, despite their duties, representations, and promises, BrightSpring and PharMerica failed to adequately secure and protect their customers' and employees' data, allowing Plaintiffs' and Class Members' Private Information to be accessed, disclosed, and misused.

69.     BrightSpring and PharMerica also owed a duty to comply with industry standards in safeguarding Private Information, which—as discussed herein—they did not do.

70.     Cyberattacks have become so notorious that the Federal Bureau of Investigation and Secret Service issued an unprecedented warning in 2019 to potential targets so that they were aware of, and prepared for, a potential attack.[16]

71.     The U.S. government, various U.S. and international law enforcement agencies, cybersecurity industry groups and laboratories, and numerous industry trade groups have issued warnings and guidance on managing and mitigating phishing and ransomware threats. There are industry best practices for cybersecurity related to phishing and ransomware, some of which are particularly effective.

72.     For example, in 2019, both Microsoft and Google publicly reported that using multi-factor authentication ("MFA") blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access. Likewise, the reputable SANS Software Security Institute issued a paper stating "[t]ime to implement multi-factor authentication!"[17] An example of MFA implementation is receiving a text with a code when you input your username and password into a website; even if a cybercriminal knew your username

---

[16] Kochman, *supra* n.171.

[17] Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW]. Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW].

and password, the cybercriminal would not be able to see the code on your phone and would thus be blocked from accessing your online account.

73.     In this regard, implementing MFA "can block over 99.9 percent of account compromise attacks."[18]

74.     Yet, instead of following these widely adopted industry standards, BrightSpring and PharMerica failed to adequately secure and protect their customers' and employees' data, allowing the Plaintiffs' and Class Members' Private Information to be accessed, disclosed, and misused.

## IV.     THE VALUE OF THE COMPROMISED PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE.

75.     BrightSpring and PharMerica understand that the protected Private Information they acquire, store, maintain, and utilize is highly sensitive and of significant value to the owners of the Private Information and those who would use it for wrongful purposes.

### A.  THE VALUE OF PRIVATE INFORMATION.

76.     Private Information is property with inherent and sizeable market value. Its value is axiomatic, considering the market value and profitability of "Big Data" corporations in America. Alphabet Inc., the parent company of Google, aptly illustrated this in its 2020 Annual Report, when it reported a total annual revenue of $182.5 billion and net income of $40.2 billion.[19] Of this revenue, $160.7 billion was derived from its Google business, which is driven almost exclusively by leveraging the Private Information it collects about the users of its various free products and

---

[18] *What Is Multi-Factor Authentication (MFA)?*, Consensus Techs. (Sept. 16, 2020), https://www.concensus.com/what-is-multi-factor-authentication/#:~:text=The%20proof%20 that%20MFA%20works,percent%20of%20account%20compromise%20attacks [https://perma.cc/RKT2-LX5Z].
[19] Alphabet Inc., Annual Report (Form 10-K) at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

services. America's largest corporations profit almost exclusively through the use of Private Information illustrating the considerable market value of Private Information.

77.     Criminal law also recognizes the value of Private Information and the serious nature of the theft of such an asset by imposing prison sentences. This strong deterrence is necessary because cybercriminals earn significant revenue through stealing Private Information. Once a cybercriminal has unlawfully acquired personal data, the criminal can demand a ransom or blackmail payment for its destruction, use the information to commit fraud or identity theft, or sell the Private Information to another cybercriminal on a thriving black market.

78.     Furthermore, Private Information is a valuable commodity to identity thieves, particularly when such data is aggregated in large numbers. Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value."  The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen Private Information for sale on anonymous websites, making the information widely available to a criminal underworld.

79.     There is an active and robust market for this information. As John Sancenito, president of *Information Network Associates*, a company which helps other companies with recovery after data breaches, explained after one data breach thta "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

80.     Thus, Plaintiffs and Class Members rightfully place a high value not only on their Private Information, but also on the privacy of that data.

81.     Once stolen, Private Information can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and Private Information. Websites appear and disappear quickly, making it a dynamic environment.

82.     The forms of Private Information involved in this Data Breach are particularly concerning. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Medicare ID numbers, Medicaid numbers, and Social Security Numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies to update the person's accounts with those entities.

## B. DATA BREACHES PUT CONSUMERS AT INCREASED RISK OF FRAUD AND IDENTIFY THEFT.

83.     Cyberattacks and data breaches of healthcare services companies are especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[20]

---

[20] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/

84.     The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[21]

85.     The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

86.     Cybercriminals use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

87.     Identity thieves can also use Social Security numbers to obtain a driver's license or other official identification cards in the victim's name, but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's Private Information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

88.     A study by the Identity Theft Resource Center ("ITRC") found that 96.7% of identity theft victims experienced costs and/or other harms from the criminal activity.[23] This

---

[21] *Private Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].
[22] *Identity Theft Recovery Steps*, FTC, https://www.identitytheft.gov/Steps (last visited Mar. 23, 2021) [https://perma.cc/ME45-5N3A].
[23] Jason Steele, *Credit Card and ID Theft Statistics*, Creditcards.com (updated Oct. 24, 2017), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php

includes devastating results such as "I lost my home/place of residence" and "I couldn't care for my family." Moreover, the harms of identity theft are not limited to the affected individual and may adversely impact other associated persons and support systems, including government assistance programs. In the ITRC study, nearly one third of survey respondents had to request government assistance as a result of the identity theft, such as welfare, EBT, food stamps, or similar support systems.[24] The ITRC study concludes that "identity theft victimization has an extreme and adverse effect on each individual as well as all of the support systems and people associated with the individual."[25]

89.     The Private Information exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiffs and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

90.     Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

91.     It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the GAO, which conducted a study regarding data breaches:

---

[https://web.archive.org/web/20171215215318/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php].
[24] *Id.*
[25] *Id.*

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[26]

92.     Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (*e.g.*, donation history or hospital records), directly and materially increase the chance that a potential victim is targeted by a spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.[27]

93.     There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Indeed, some of the Plaintiffs and many Class Members are in very early stages of their lives—in their twenties and thirties. Thus, as the respective Notices advise, Plaintiffs must vigilantly monitor their financial accounts for many years to come.

94.     BrightSpring and PharMerica are highly sophisticated parties that regularly handle sensitive Private Information, yet they failed to establish and/or implement appropriate administrative, technical, and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and other Class Members' Private Information to protect against anticipated threats of intrusion of such information.

95.     Thus, BrightSpring and PharMerica knew, or should have known, the importance of safeguarding the Private Information entrusted to them and of the foreseeable consequences if

---

[26] GAO Report, *supra* n.21, at 29.

[27] *See* Kelion & Tidy, *supra* n.**Error! Bookmark not defined.** (concluding that personal information such as " names, titles, telephone numbers, email addresses, mailing addresses, dates of birth, and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests, and other donor profile information . . . . in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware").

their systems were breached. BrightSpring and PharMerica failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

96. Thus, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

## V. THE DATA BREACH DAMAGED PLAINTIFFS AND CLASS MEMBERS.

97. As a result of BrightSpring's and PharMerica's deficient security and monitoring measures, Plaintiffs and Class Members have been harmed by the compromise of their sensitive Private Information, which is currently for sale on the dark web and through private sale to other cyber criminals and/or being used by criminals for identify theft and other fraud-related crimes.

98. Plaintiffs and Class Members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their Social Security numbers, bank account numbers, emails, phone numbers, and physical addresses as a result of the Data Breach. These specific types of information are associated with a high risk of fraud.

99. Plaintiffs and Class Members also suffered a "loss of value" of their sensitive Private Information when it was stolen by hackers in the Data Breach. A robust market exists for stolen Private Information. Hackers sell Private Information on the dark web—an underground market for illicit activity, including the purchase of hacked Private Information—at specific identifiable prices. This market serves to determine the loss of value to Plaintiffs and Class Members.

100. As discussed above, Plaintiffs' and Class Members' stolen Private Information is a valuable commodity to identity thieves.

101. Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiffs and Class Members gathered from underground sources, public

sources, or even Plaintiffs' and Class Members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiffs and Class Members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiffs' and Class Members' names, taking out loans in Plaintiffs' and Class Members' names, using Plaintiffs' and Class Members' information to obtain government benefits, filing fraudulent tax returns using Plaintiffs' and Class Members' information, obtaining Social Security numbers in Plaintiffs' and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

102.    Plaintiffs and Class Members also suffered "benefit of the bargain" damages. Plaintiffs and Class Members overpaid for services that should have been—but were not—accompanied by adequate data security. Part of the fees paid by Plaintiffs and Class Members to BrightSpring and PharMerica was intended to be used to fund adequate data security. Plaintiffs and Class Members did not get what they paid for.

103.    Plaintiffs and Class Members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach.

104.    Plaintiffs and Class Members may also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

105.    Class Members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent Class Members are charged

monthly or annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class Members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement cards. The inability to use payment cards may also result in missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

106. In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

107. A victim whose Private Information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose Private Information has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

108. The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

VI. **BRIGHTSPRING AND PHARMERICA'S FAILURE TO NOTIFY PLAINTIFFS AND CLASS MEMBERS IN A TIMELY OR ADEQUATE FASHION EXACERBATED THE DAMAGE.**

109.    As detailed above, BrightSpring and PharMerica waited two months to send the first round of notification letters, which turned out to be deficient. PharMerica sent defective notice on May 12, 2023, which had to be re-issued on June 9, 2023, and BrightSpring did not begin sending notices until June 21, 2023. BrightSpring and PharMerica delayed notification despite the fact that the information stolen by Money Message was posted publicly on a forum known to be frequented by malicious actors on April 9, 2023.

110.    The period of almost two months during which BrightSpring and PharMerica sat on the information before sending the first round of notification letters could have been used by Plaintiffs and Class Members to take steps to mitigate the damage caused by the Data Breach.

111.    The fact that the first round of notification letters—sent only to administrators and executors of estates—was deficient only exacerbates the problem.

112.    Most individuals were not notified until mid-to-late June 2023 that their information had been impacted in the Data Breach.

113.    Instead, and to protect its own financial interests, BrightSpring and PharMerica concealed the extent of Data Breach for almost three months, allowing the unauthorized third-party and anyone else who downloaded the data to potentially exploit Plaintiffs' and Class Members' Private Information without any mitigation steps being taken. BrightSpring and PharMerica did this despite *knowing that the information was in possession of bad actors looking to exploit the Private Information for profit and that it had been posted publicly for download*, a fact BrightSpring and PharMerica knew shortly after discovery of the Data Breach.

114.    Plaintiffs and members of the Classes were thus deprived of the opportunity to take any steps to prevent damage by BrightSpring's and PharMerica's concealment of the Data Breach

and failure to provide timely and adequate notice of the Data Breach to Plaintiffs and Class Members.

## CLASS ACTION ALLEGATIONS

115.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Nationwide Class:

> All individuals whose Private Information was compromised in the Data Breach impacting BrightSpring and PharMerica systems in March 2023 (the "Nationwide Class" or the "Class" and, together with the Indiana Subclass and South Carolina Subclass, the "Classes").

116.     Plaintiffs reserve the right to modify, expand, or amend the above Nationwide Class definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## INDIANA SUBCLASS

117.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Indiana Subclass:

> All persons in Indiana whose Private Information was compromised in the Data Breach impacting BrightSpring and PharMerica systems in March 2023 (the "Indiana Subclass").

118.     Plaintiffs reserve the right to modify, expand, or amend the above Indiana Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## SOUTH CAROLINA SUBCLASS

119.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following South Carolina Subclass:

> All persons in South Carolina whose Private Information was compromised in the Data Breach impacting BrightSpring and PharMerica systems in March 2023 (the "South Carolina Subclass" and, together with the Indiana Subclass, the "State Subclasses").

120.     Plaintiffs reserve the right to modify, expand, or amend the above South Carolina Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

121.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

122.     **Numerosity**. All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The Members of the Nationwide Class and the State Subclasses are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiffs are informed and believe that there are likely millions of Members of the Classes, the precise number of Class Members is unknown to Plaintiffs. Class Members may be identified through objective means. Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

123.     **Commonality and Predominance**. All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

      a.   Whether Defendants engaged in active misfeasance and misconduct alleged herein;

      b.   Whether Defendants owed a duty to Class Members to safeguard their sensitive Private Information;

c. Whether Defendants breached their duty to Class Members to safeguard their sensitive Prviate Information;

d. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

e. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of the Data Breach;

f. Whether Defendants' failure to provide adequate security proximately caused Plaintiffs' and Class Members' injuries; and

g. Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

124. **Typicality.** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs' claims are typical of the claims of all Class and Subclass Members because Plaintiffs, like other Class and Subclass Members, suffered theft of their sensitive Private Information in the Data Breach.

125. **Adequacy of Representation.** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs are adequate Class representatives because they are Members of the Classes and State Subclasses and their interests do not conflict with the interests of other Class and Subclass Members that they seek to represent. Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the Class's interests.

126. **Predominance and Superiority.** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

127. **Cohesiveness**. All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Defendants have acted, or refused to act, on grounds generally applicable to the Nationwide Class and State Subclasses such that final declaratory or injunctive relief is appropriate.

128. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on newly learned facts or legal developments that arise following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### COUNT 1
### NEGLIGENCE
**(On behalf of the Nationwide Class, or alternatively, the State Subclasses)**

129. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

130. Defendants collected, stored, maintained, and utilized Plaintiffs' and Class Members' Private Information in the course of offering services to and/or employing Plaintiffs and Class Members.

131. By collecting and maintaining sensitive Private Information, Defendants had a common law duty of care to use reasonable means to secure and safeguard the sensitive Private Information and to prevent disclosure of the information to unauthorized individuals. Defendants' duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

132. Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with the various statutory requirements, regulations, and other notices described above.

133. Defendants' duty of care arose as a result of, among other things, the special relationship that existed between Defendants and their customers and employees. BrightSpring and PharMerica, who Plaintiffs and Class Members entrusted their Private Information with, were the only parties in a position to ensure that their systems were sufficient to protect against the foreseeable risk that a data breach could occur that would result in substantial harm to consumers.

134. Defendants were subject to an "independent duty" untethered to any contract between Plaintiffs and Class Members and Defendants.

135. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect customers' and employees' sensitive Private Information. Defendants' negligent acts and omissions include, but are not limited to, the following:

a. failure to employ systems and educate employees to protect against malware;

b. failure to comply with industry standards for software and server security;

c. failure to track and monitor access to their networks and Private Information stored therein;

d. failure to limit access to those with a valid purpose;

e. failure to adequately staff and fund their data security operation;

f. failure to remove, delete, or destroy highly sensitive PrivateInformation of consumers that is no longer being used for any valid business purpose;

g. failure to use due care in hiring, promoting, and supervising those responsible for their data security operations;

h. failure to recognize that hackers were stealing Private Information from their networks while the Data Breach was taking place; and

i. failure to oversee the entrustment of customers' and employees' Private Information.

136. It was foreseeable to Defendants that a failure to use reasonable measures to protect theircustomers' and employees' sensitive Private Information could result in injury to consumers. Further, actual and attempted breaches of data security were reasonably foreseeable to Defendants given the known frequency of data breaches and various warnings from industry experts.

137. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

138. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, among other things: (i) strengthen their data security systems and monitoring

procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

## COUNT 2
### NEGLIGENCE *PER SE*
**(On behalf of the Nationwide Class, or alternatively, the State Subclasses)**

139.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

140.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendants for failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

141.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and disclosed and the foreseeable consequences of a data breach.

142.    Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

143.    Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against.  Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

144.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

145.     Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

146.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

## COUNT 3
## BREACH OF IMPLIED CONTRACT
### (On behalf of the Nationwide Class, or alternatively, the State Subclasses)

147.     Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

148.     When Plaintiffs and Class Members provided their sensitive Private Information to Defendants in exchange for Defendants' services, they entered into implied contracts with Defendants under which Defendants agreed to take reasonable steps to protect their sensitive Private Information.

149.     Defendants solicited and invited Plaintiffs and Class Members to provide their sensitive Private Information as part of their regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their sensitive Private Information to Defendants.

150.     Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Defendants.

151.     Plaintiffs and Class Members paid money (directly and/or indirectly) to Defendants or provided services to Defendants and Plaintiffs and Class Members therefore reasonably

believed and expected that Defendants would use part of those funds to obtain and oversee adequate data security. Defendants failed to do so.

152.    Plaintiffs and Class Members would not have provided their sensitive Private Information to Defendants in the absence of Defendants' implied promise to keep their sensitive Private Information reasonably secure.

153.    Plaintiffs and Class Members fully performed their obligations under the implied contracts by paying money to Defendants.

154.    Defendants breached their implied contracts with Plaintiffs and Class Members by failing to implement reasonable data security measures.

155.    As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

156.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

**COUNT 4**
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class, or alternatively, the State Subclasses)**

157.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

158.    Plaintiffs and Class Members conferred a monetary benefit upon Defendants in the form of monies paid while utilizing Defendants' services or services conferred upon Defendants through employment.

159.    Defendants appreciated or had knowledge of the benefits conferred upon them by Plaintiffs and Class Members. Defendants also benefited from the receipt of Plaintiffs' and Class Members' sensitive Private Information as this was utilized by Defendants to send bills and process payments for services, and employ individuals, among other things.

160.    The monies Plaintiffs and Class Members paid to Defendants were supposed to be used by Defendants, in part, to pay for and oversee adequate data privacy infrastructure, practices, and procedures, as were the services provided to Defendants by employees.

161.    Defendants' conduct caused Plaintiffs and Class Members to suffer actual damages in an amount equal to the difference in value between what they paid for (Defendants' services made with adequate data privacy and security practices and procedures) or serviced for (Defendants' adequate data privacy and security practices and procedures during their employment), and what they actually received (Defendants' services or employment without adequate data privacy and security practices and procedures).

162.    In equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members because Defendants failed to oversee, implement, or adequately implement, the data privacy and security practices and procedures that Plaintiffs and Class Members paid for or serviced for and that were otherwise mandated by federal, state, and local laws and industry standards.

163.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT 5**
**BREACH OF CONFIDENCE**
**(On behalf of the Nationwide Class, or alternatively, the State Subclasses)**

164. Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

165. Plaintiffs and Class Members maintained a confidential relationship with Defendants whereby Defendants undertook a duty not to disclose to unauthorized parties the Private Information provided by Plaintiffs and Class Members. Such Private Information was confidential and novel, highly personal and sensitive, and not generally known.

166. Defendants knew Plaintiffs' and Class Members' Private Information was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreeing to protect the confidentiality and security of the Private Information they collected, stored, and maintained.

167. As a result of the Data Breach, there was an unauthorized disclosure of Plaintiffs' and Class Members' Private Information in violation of this understanding. The unauthorized disclosure occurred because Defendants failed to implement and maintain reasonable safeguards to protect the Private Information in their possession and failed to comply with industry-standard data security practices.

168. Plaintiffs and Class Members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

169. But for Defendants' disclosure of Plaintiffs' and Class Members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendants' Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' Private Information, as well as the resulting damages. The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized

disclosure of Plaintiffs' and Class Members' Private Information. Defendants knew their computer systems and technologies for accepting, securing, and storing Plaintiffs' and members of the Class' Private Information had serious security vulnerabilities because Defendants failed to observe even basic information security practices or correct known security vulnerabilities.

170.    As a direct and proximate result of Defendants' breach of confidence, Plaintiffs and members of the Class have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Defendants; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

### COUNT 6
### INVASION OF PRIVACY – INTRUSION UPON SECLUSION
**(On behalf of the Nationwide Class, or alternatively, the State Subclasses)**

171.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

172.    Plaintiffs shared Private Information with Defendants that Plaintiffs wanted to remain private and non-public.

173.    Plaintiffs reasonably expected that the Private Information they shared with Defendants would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties or disclosed or obtained for any improper purpose.

174.    Defendants intentionally intruded into Plaintiffs' and Class Members' seclusion by disclosing without permission their Private Information to a third party who then sold their Private Information to other third-parties on the dark web.

175.    By failing to keep Plaintiffs' and Class Members' Private Information secure, and disclosing Private Information to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, *inter alia*:

> a.   intruding into their private affairs in a manner that would be highly offensive to a reasonable person;
>
> b.   invading their privacy by improperly using their Private Information that was properly obtained for another purpose, or disclosing it to unauthorized persons;
>
> c.   failing to adequately secure their Private Information from disclosure to unauthorized persons; and
>
> d.   enabling the disclosure of their Private Information without consent.

176.    The Private Information that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included Social Security numbers and other Private Information.

177. Defendants' intrusions into Plaintiffs' and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

178. As a direct and proximate result of Defendants' invasions of privacy, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Defendants; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**COUNT 7**
**INDIANA DECEPTIVE CONSUMER SALES ACT**
**Ind. Code §§ 24-5-0.5-1, *et seq.***
**(On behalf of Plaintiff Slaughter and the Indiana Subclass)**

179. Plaintiff Slaughter individually and on behalf of the Indiana Subclass, repeats and realleges all allegations as if fully set forth herein.

180. Defendants are each a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

181. Defendants are each a "supplier" as defined by § 24-5-0.5-2(a)(1), because they regularly engage in or solicit "consumer transactions," within the meaning of § 24-5-0.5-2(a)(3)(A).

182. Defendants engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3(a).

183. Defendants' representations and omissions include both implicit and explicit representations, including:

    a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Slaughter's and Indiana Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Slaughter's and Indiana Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

    d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Slaughter's and Indiana Subclass Members' PII, including by implementing and maintaining reasonable security measures;

    e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Slaughter's and

Indiana Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Slaughter's and Indiana Subclass members' PII; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Slaughter's and Indiana Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

184.    Defendants' acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

185.    The injury to consumers from Defendants' conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk to the safety of their PII or the security of their identity or credit. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

186.    Consumers could not have reasonably avoided injury because Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of their data security, Defendants created an asymmetry of information between them and consumers that precluded consumers from taking action to avoid or mitigate injury.

187.     Defendants' inadequate data security had no countervailing benefit to consumers or to competition.

188.     Defendants' acts and practices were "abusive" for numerous reasons, including:

    a.  Because they materially interfered with consumers' ability to understand a term or condition in a consumer transaction. Defendants' failure to disclose the inadequacies in their data security interfered with consumers' decision-making in a variety of their transactions.

    b.  Because they took unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a consumer transaction. Without knowing about the inadequacies in Defendants' data security, consumers lacked an understanding of the material risks and costs of a variety of their transactions.

    c.  Because they took unreasonable advantage of consumers' inability to protect their own interests. Consumers could not protect their interests due to the asymmetry in information between them and Defendants concerning the state of Defendants security, and because it is functionally impossible for consumers to obtain credit without their PII being in Defendants' systems.

    d.  Because Defendants took unreasonable advantage of consumers' reasonable reliance that it was acting in their interests to secure their data. Consumers' reliance was reasonable for the reasons discussed below.

189.     Defendants also engaged in "deceptive" acts and practices in violation of Indiana Code § 24-5-0.5-3(a) and § 24-5-0.5-3(b), including:

a. Misrepresenting that the subject of a consumer transaction has performance, characteristics, or benefits it does not have which the supplier knows or should reasonably know it does not have;

b. Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and

c. Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., more data security) than the supplier intends or reasonably expects.

190. Defendants intended to mislead Plaintiff Slaughter and Indiana Subclass Members and induce them to rely on their misrepresentations and omissions.

191. Defendants' misrepresentations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

192. Had Defendants disclosed to Plaintiff Slaughter and Indiana Subclass Members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiff Slaughter and the Indiana Subclass. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff Slaughter and Indiana Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

193. Defendants had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the PII in their possession, and the generally accepted professional standards. This duty arose due to the representations and relationship between Defendants and Plaintiff Slaughter and the Indiana Subclass as described herein. In addition, such a duty is implied by law due to the nature of the relationship between consumers-including Plaintiff Slaughter and the Indiana Subclass-and Defendants, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants. Defendants' duty to disclose also arose from their:

      a.  Possession of exclusive knowledge regarding the security of the data in their systems;

      b.  Active concealment of the state of their security; and/or

      c.  Incomplete representations about the security and integrity of their computer and data systems, and their prior data breaches, while purposefully withholding material facts from Plaintiff Slaughter and the Indiana Subclass that contradicted these representations.

194. Defendants acted intentionally, knowingly, and maliciously to violate Indiana's Deceptive Consumer Sales Act, and recklessly disregarded Plaintiff Slaughter's and Indiana Subclass Members' rights. Defendants' actions were not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

195. Defendants' conduct includes incurable deceptive acts that Defendants engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8). As a direct and proximate result of Defendants' uncured or incurable unfair, abusive, and deceptive acts or practices, Plaintiff Slaughter and Indiana Subclass Members have suffered

and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

196.    Defendants' violations present a continuing risk to Plaintiff Slaughter and Indiana Subclass Members as well as to the public.

197.    Plaintiff Slaughter and Indiana Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

## COUNT 8
### SOUTH CAROLINA DATA BREACH SECURITY ACT
#### S.C. Code Ann. §§ 39-1-90, *et seq.*
#### (On behalf of Plaintiff Collins and the South Carolina Subclass)

198.    Plaintiff Collins individually, and on behalf of the South Carolina Subclass, repeats and realleges all allegations if fully set forth herein.

199.    Defendants are each a business that owns or licenses computerized data or other data that includes personal identifying information (for the purpose of this count, "PII"), as defined by S.C. Code Ann. § 39-1-90(A).

200.    Plaintiff Collins' and South Carolina Subclass Members' PII (*e.g.,* Social Security numbers) includes personal identifying information as covered under S.C. Code Ann. § 39-1-90(D)(3).

201.     Defendants are required to accurately notify Plaintiff Collins and South Carolina Subclass Members following discovery or notification of a breach of their data security systems if PII that was not rendered unusable through encryption, redaction, or other methods was, or was reasonably believed to have been, acquired by an unauthorized person, creating a material risk of harm, in the most expedient time possible and without unreasonable delay under S.C. Code Ann. § 39-1-90(A).

202.     Because Defendants discovered a breach of their data security systems in which PII that was not rendered unusable through encryption, redaction, or other methods, was, or was reasonably believed to have been, acquired by an unauthorized person, creating a material risk of harm, Defendants had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by S.C. Code Ann. § 39-1-90(A).

203.     By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated S.C. Code Ann. § 39-1-90(A).

204.     As a direct and proximate result of Defendants' violations of S.C. Code Ann. § 39-1-90(A), Plaintiff Collins and South Carolina Subclass Members suffered damages, as described above.

205.     Plaintiff Collins and South Carolina Subclass Members seek relief under S.C. Code Ann. § 39-1-90(G), including actual damages and injunctive relief.

### COUNT 9
**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**S.C. Code Ann. §§ 39-5-10, *et seq.***
**(On behalf of Plaintiff Collins and the South Carolina Subclass)**

206.     Plaintiff Collins individually, and on behalf of the South Carolina Subclass, repeats and realleges all allegations if fully set forth herein.

207.     Defendants are each a "person," as defined by S.C. Code Ann. § 39-5-10(a).

208.    South Carolina's Unfair Trade Practices Act (SC UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20.

209.    Defendants advertised, offered, or sold goods or services in South Carolina and engaged in trade or commerce directly or indirectly affecting the people of South Carolina, as defined by S.C. Code Ann. § 39-5-10(b).

210.    Defendants engaged in unfair and deceptive acts and practices, including:

a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Collins' and Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b.    Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Collins' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.    Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Collins' and Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e.    Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Collins' and South

Carolina Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

    f.   Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff Collins' and South Carolina Subclass Members' PII; and

    g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Collins' and South Carolina Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

211.    Defendants' acts and practices had, and continue to have, the tendency or capacity to deceive.

212.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

213.    Defendants intended to mislead Plaintiff Collins and South Carolina Subclass Members and induce them to rely on their misrepresentations and omissions.

214.    Had Defendants disclosed to Plaintiff Collins and the South Carolina Subclass that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiff Collins and the South Carolina Subclass. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff Collins and the South Carolina

Subclass acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

215. Defendants had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the PII in their possession, and the generally accepted professional standards. Such a duty is also implied by law due to the nature of the relationship between consumers—including Plaintiff Collins and the South Carolina Subclass—and Defendants, because consumers are unable to fully protect their interests with regard to the PII in Defendants' possession and placed trust and confidence in Defendants. Defendants' duty to disclose also arose from their:

a. Possession of exclusive knowledge regarding the security of the data in their systems;

b. Active concealment of the state of their security; and/or

c. Incomplete representations about the security and integrity of their computer and data systems, and their prior data breaches, while purposefully withholding material facts from Plaintiffs and the South Carolina Subclass that contradicted these representations.

216. Defendants' business acts and practices offend an established public policy, or are immoral, unethical, or oppressive. Defendants' acts and practices offend established public policies that seek to protect consumers' PII and ensure that entities entrusted with PII use appropriate security measures. These public policies are reflected in laws such as the FTC Act, 15 U.S.C. § 45; and the South Carolina Data Breach Security Act, S.C. Code § 39-1-90, *et seq.*

217. Defendants' failure to implement and maintain reasonable security measures was immoral, unethical, or oppressive given the sensitivity and extensivity of PII in their possession;

their special role as a linchpin of the healthcare system; and their admitted duty of trustworthiness and care as an entrusted protector of data.

218.    Defendants' unfair and deceptive acts or practices adversely affected the public interest because such acts or practices have the potential for repetition; Defendants engage in such acts or practices as a general rule; and such acts or practices impact the public at large, including many South Carolinians impacted by the Data Breach.

219.    Defendants' unfair and deceptive acts or practices have the potential for repetition because the same kinds of actions occurred in the past, including numerous past data breaches, thus making it likely that these acts or practices will continue to occur if left undeterred. Additionally, Defendants' policies and procedures, such as their security practices, create the potential for recurrence of the complained of business acts and practices.

220.    Defendants' violations present a continuing risk to Plaintiffs and South Carolina Subclass Members as well as to the general public.

221.    Defendants intended to mislead Plaintiff Collins and South Carolina Subclass Members and induce them to rely on their misrepresentations and omissions.

222.    Defendants acted intentionally, knowingly, and maliciously to violate South Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff Collins and South Carolina Subclass Members' rights. Defendants' numerous past data breaches put them on notice that their security and privacy protections were inadequate. In light of this conduct, punitive damages would serve the interest of society in punishing and warning others not to engage in such conduct and would deter Defendants and others from committing similar conduct in the future.

223.    As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff Collins and South Carolina Subclass Members have suffered and will continue

to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach.

224.    Plaintiff Collins and South Carolina Subclass Members seek all monetary and non-monetary relief allowed by law, including damages for their economic losses; treble damages; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

### COUNT 10
### DECLARATORY AND INJUNCTIVE RELIEF
**(On behalf of the Nationwide Class, or alternatively, the State Subclasses)**

225.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

226.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

227.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and statutory duties to reasonably safeguard their customers' and employees' sensitive Private Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches. Plaintiffs alleges that Defendants' data security practices remain inadequate.

228.     Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their sensitive Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

229.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants continue to owe a legal duty to secure consumers' sensitive Private Information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure customers' and employees' sensitive Private Information.

230.     The Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect consumers' sensitive Private Information.

231.     If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, for which they lack an adequate legal remedy. The threat of another data breach is real, immediate, and substantial. If another breach at BrightSpring or PharMerica occurs, Plaintiffs and Class Members will not have an adequate remedy at law, because not all of the resulting injuries are readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

232.     The hardship to Plaintiffs and Class Members if an injunction does not issue greatly exceeds the hardship to Defendants if an injunction is issued. If another data breach occurs at BrightSpring or PharMerica, Plaintiffs and Class Members will likely be subjected to substantial identify theft and other damages. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

233.    Issuance of the requested injunction will serve the public interest by preventing another data breach at BrightSpring or PharMerica, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose confidential information would be further compromised.

## REQUEST FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter judgment against BrightSpring and PharMerica including the following:

A. Determining that this matter may proceed as a class action and certifying the Classes asserted herein;

B. Appointing Plaintiffs as representative of the applicable Classes and appointing Plaintiffs' counsel as Class counsel;

C. An award to Plaintiffs and the Classes of compensatory, consequential, statutory, restitution, and treble damages as set forth above;

D. Ordering injunctive relief requiring Defendants to, among other things: (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; (iii) provide several years of free credit monitoring and identity theft insurance to all Class Members; (iv) timely notify consumers of any future data breaches; and (v) delete or destroy any legacy consumer data that it is not necessary to keep for business purposes;

E. Entering a declaratory judgment stating that Defendants owe a legal duty to secure consumers' and employees' sensitive Private Information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure sensitive Private Information;

F. An award of attorneys' fees, costs, and expenses, as provided by law or in equity;

G. An award of pre-judgment and post-judgment interest, as provided by law or equity; and

H. Such other relief as the Court may allow.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

DATED: July 3, 2023

*/s/ John Abaray*
John Abaray (KBA #96629)
Nicholas Craddock (KBA #96338)
Patrick J. Smith (KBA #95724)
ABARAY CRADDOCK & SMITH, PLLC
12800 Townepark Way, Ste. 202
Louisville, KY 40243
Main: 502-215-0257
Direct: 502-519-7948
Fax: 502-717-0576
john@acslawky.com
Counsel for Plaintiff

*Pending Admission Pro Hac Vice*
Ian W. Sloss
Johnathan Seredynski
Krystyna Gancoss
SILVER GOLUB & TEITELL LLP
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Fax: (203) 325-3769
isloss@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com

*Counsel for Plaintiffs*